UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSCAR A. CLIFTON,<br><br>Plaintiff,<br><br>v.<br><br>BOB EDWARD BYRD, Tulare County Sheriff's Officer, et al.,<br><br>Defendants. | 1:08-cv-00193-AWI-SMS<br><br>ORDER DISMISSING PLAINTIFF'S COMPLAINT WITH LEAVE TO FILE AN AMENDED COMPLAINT NO LATER THAN THIRTY DAYS AFTER THE DATE OF SERVICE OF THIS ORDER (DOC. 1) |

Plaintiff is a state prisoner who is proceeding pro se with an action for damages and other relief concerning alleged civil rights violations. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rules 72-302 and 72-304. Pending before the Court is Plaintiff's complaint, filed on February 7, 2008.

I. Screening the Complaint

A. Legal Standards

The Court must screen complaints brought by prisoners seeking relief against a governmental entity or officer. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion

thereof if the Court determines that an allegation of poverty is untrue or that the action is 1) frivolous or malicious, 2) fails to state a claim upon which relief may be granted, or 3) seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915A(b), 1915(e)(2).

In reviewing a complaint under this standard, the Court must accept as true the allegations of the complaint in question, Hospital Bldg. Co. v. Trustees of Rex Hospital, 425 U.S. 738, 740 (1976), construe the pro se pleadings liberally in the light most favorable to the Plaintiff, Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000), and resolve all doubts in the Plaintiff's favor, Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).

If the Court determines that the complaint fails to state a claim, leave to amend should be granted to the extent that the deficiencies of the complaint can be cured by amendment. Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc). A complaint, or a portion thereof, should only be dismissed for failure to state a claim upon which relief may be granted if it appears beyond doubt that the Plaintiff can prove no set of facts, consistent with the allegations, in support of the claim or claims that would entitle him to relief. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Palmer v. Roosevelt Lake Log Owners' Ass'n., Inc., 651 F.2d 1289, 1294 (9th Cir. 1981). Dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the Plaintiff cannot prevail on the facts that he has alleged and that an opportunity to amend would be futile. Lopez v. Smith, 203 F.3d at 1128.

A claim is frivolous if it lacks an arguable basis either in law or fact. Neitzke v. Williams, 490 U.S. 319, 324 (1989). A frivolous claim is based on an inarguable legal conclusion or a fanciful factual allegation. Id. A federal court may dismiss a claim as frivolous if it is based on an indisputably meritless legal theory or if the factual contentions are clearly baseless. Id.

The test for malice is a subjective one that requires the Court to determine whether the applicant is proceeding in good faith. Kinney v. Plymouth Rock Squab. Co., 236 U.S. 43, 46 (1915); see Wright v. Newsome, 795 F.2d 964, 968 n. 1 (11th Cir. 1986). A lack of good faith is most commonly found in repetitive suits filed by plaintiffs who have used the advantage of cost-free filing to file a multiplicity of suits. A complaint may be inferred to be malicious if it suggests an intent to vex the defendants or abuse the judicial process by relitigating claims decided in prior cases, Crisafi v. Holland, 655 F.2d 1305, 1309 (D.C.Cir. 1981); if it threatens violence or contains disrespectful references to the Court, id.; or if it contains untrue material allegations of fact or false statements made with knowledge and an intent to deceive the Court, Horsey v. Asher, 741 F.2d 209, 212 (8th Cir. 1984).

B. Plaintiff's Complaint

Plaintiff seeks to overturn the denial by the California trial court, the California Court of Appeal, Fifth Appellate District, and the California Supreme Court, of his attempt to obtain post-conviction DNA testing, pursuant to Cal. Penal Code § 1405, of evidence related to Plaintiff's conviction of the murder

of Donna Jo Richmond. (Cmplt. pp. 4, 15.) Plaintiff also seeks "sanctions" against various persons in connection with alleged suppression of evidence at his trial in 1976 or thereafter in relation to post-conviction proceedings involving habeas corpus or attempts to obtain DNA testing of evidence pursuant to Cal. Penal Code § 1405. (Cmplt. p. 26.)[1] Plaintiff provides no comprehensive summary of the evidence introduced at trial, but he alleges that he was convicted entirely with circumstantial evidence, and there was no physical evidence or eye-witness to the murder.

Plaintiff states that this action is not brought to overturn the conviction; rather, Plaintiff seeks a reversal of the California courts' denial of his request for post-conviction DNA testing of forty-six hair slides that were not available when original post-conviction DNA testing was completed in April 2002 in order that he might ultimately file a writ to overturn his conviction. (Id. p. 5.) Plaintiff seeks injunctive relief against the California courts named as Defendants to require them to do DNA testing on the twenty-three hair slides now available but not

[1] Plaintiff asks that Defendant Byrd be sanctioned for ordering all evidence destroyed in February 1976, a time at which Plaintiff alleges he had been sentenced to death for only 159 days; Plaintiff seeks money damages.

Plaintiff seeks to have Defendant Morton, the criminologist, sanctioned because he suppressed during trial true ABO test results, which would have shown Morton committed perjury by telling the jurors that item 16-B, hair on Plaintiff's white sweater, was not similar to anyone except the victim and Relinda Clifton, and he misled everyone about a hair slide located in June 2002 as not being the one with the victim's semen. (Id. p. 26.)

Plaintiff seeks sanctions for District Attorney Jay Powell for suppressing true ABO test results, suborning perjury by Morton, and repeating it in his closing argument.

Plaintiff seeks to sanction Deputy Attorney General David A. Rhodes for telling the California courts that all the hairs were reference hairs when in fact twenty-three of them were collected as evidence and should be DNA tested. (Id. p. 26.)

located in time for the first DNA testing ordered by the Court; to test the latent fingerprints inside and outside Plaintiff's pickup because the prosecutor misled the jury and said they were only smudges; and to test any other evidence that might be found. (Cmplt. pp. 26-27.) Plaintiff argues that DNA testing was not available in 1975 when Plaintiff was arrested.

Plaintiff sues Bob E. Byrd, former Tulare County Sheriff's Officer; Charles V. Morton, criminologist; Jay Powell, former Tulare County District Attorney; David A. Rhodes, Deputy Attorney General; the Tulare County Superior Court; the Fifth District Appellate Court; and the California Supreme Court. These people and entities were involved in Plaintiff's criminal case. (Cmplt. p. 27.) Some of them also have been involved to some extent with respect to Plaintiff's later efforts, which were somewhat successful, to obtain DNA testing of various items of evidence associated with the murder.

Plaintiff alleges that he was sentenced to death and taken to death row on September 23, 1976. On February 28, 1977, Defendant Deputy Sheriff Byrd ordered all evidence destroyed. (Cmplt. p. 4.) Plaintiff alleges that the prosecutor had advised the court that all other evidence had been destroyed in 1977 and that no other evidence existed. (Id. p. 5.)

1. Knife and Victim's Effects

Plaintiff refers to original, post-conviction DNA testing procedures in state-court proceedings beginning 2001 and resulting in an order dated October 1, 2002, by Judge William Silveira, to test the remaining biological evidence from Plaintiff's case, namely, the victim's pants, her underpants, her

sanitary napkin, and Plaintiff's pocket knife. (Cmplt. p. 8.) Testing was completed on April 24, 2002. Although Plaintiff refers to "Exhibit 'B'," a copy of the testing report of Dr. Edward Blake, a forensic scientist, that exhibit is not attached to the complaint. (Cmplt. p. 9.) In October 2002, only four items (the victim's pants, underpants, sanitary napkin and Defendant's pocket knife) were ordered tested, although many other items still existed. (Id. p. 8.) Plaintiff asserts that it was represented that there was no other evidence that could be tested.

With respect to Plaintiff's pocket knife, Plaintiff alleges that the testing of debris and blood on the surfaces of the knife revealed that the blood under the blades and inside Plaintiff's pocket knife did not match the victim's blood type or genes. (Cmplt. pp. 9-11.) At trial the prosecutor had argued that the knife had been used to murder the victim and then had been cleaned. Plaintiff contends that the fact that the testing revealed blood in the debris inside the knife under where the blades close tends to show that the knife was not cleaned, and that it could not have been used to murder the victim and then have been cleaned, as had been argued by the prosecutor at trial.

Plaintiff argues that the DNA test results from April 2002 proved that Plaintiff was not linked by DNA test results to the three items belonging to the victim (her pants, her underpants, and her sanitary napkin).

2. Forty-six Hair Slides

Plaintiff alleges that on June 12, 2002, after the original, post-conviction DNA testing was ordered and completed, forty-six

hair slides were located; thus, they were not available at the time of the completion of the originally ordered, post-conviction DNA testing on April 24, 2002. (Cmplt. pp. 5, 19.) Copies were turned over to Plaintiff on June 27, 2002.

Plaintiff also alleges that some of the hair slides had been previously ABO tested both before and during trial, but ABO test results that were favorable to Plaintiff were suppressed and not disclosed until almost twenty-three years later through a federal court discovery order. (Id.) Further, test results from June 24, 2002, proved as to the original June 1976 ABO test result, no evidence linked Plaintiff to the murder. (Cmplt. p. 12.)

Plaintiff specifically asserts that prosecutor Powell suppressed the June 1976 ABO test chart results of a hair, item 16-B, removed from Plaintiff's white sweater. He argues that Defendants Morton and Powell had to know from then-existing ABO lab test results on item 16-B, which Plaintiff purports to record, that the hair was most likely Plaintiff's own hair and could not possibly have been the victim's. (Cmplt. at 16-17.) Plaintiff states that during trial, Defendant Morton misrepresented the test results because he stated that the hair was not similar to that of anyone except the victim and Relinda Clifton, Plaintiff's daughter. (Id. pp. 12-14, 17.) During trial, Defendant Powell suppressed the true test results, questioned Morton, and argued to the jury on the basis of the hair's having been compatible with either the victim or Relinda Clifton, Plaintiff's daughter. (Id. pp. 17-18.) Plaintiff argues that therefore DNA testing should have been ordered of the hair. Plaintiff asserts that the nondisclosure of the favorable ABO

test results on item 16-B denied Plaintiff a critical aspect of his defense.

Plaintiff alleges that Deputy Attorney General Rhodes led the state court to believe that all of the forty-six hair slides were reference hairs; however, twenty-three of the newly found hair slides were collected as evidence. Plaintiff refers to Rhodes's argument in an informal response (presumably in state court proceedings) that some of the hairs remained in the custody of a forensic analyst, but that those were not the pubic hairs containing the perpetrator's semen. (Cmplt. pp. 12.)

Plaintiff further alleges that records reflect that one sample of the victim's pubic hair was collected and is still among the forty-six hair slides located in June 2002, and among the copies of the hair slides released to Plaintiff on June 27, 2002. (Id. pp. 12-14.)

Plaintiff also refers to various additional hairs collected from one of two white cloths found in the same area as one of the victim's shoes (44), from the seatbelt of Plaintiff's pickup truck (33), from a ski cap found in the area of the body, and a pubic hair of the victim (C-51028, which Plaintiff alleges must have been the pubic hair with the semen on it), and to other documentary and physical exhibits, none of which is attached to the complaint. (Cmplt. pp. 19-22.)

Plaintiff states that the court, prosecutor, and Deputy Attorney General Rhodes have been reluctant to allow DNA testing on the pubic hair or on twenty-three of the located hair slides. (Id. p. 14.)

/////

3. Fingerprints

Plaintiff also complains that in arguing the case to the jury, Defendant Jay Powell misrepresented the non-existence of latent fingerprints; Plaintiff wants the prints, which were lifted from his pickup truck, compared with those of officers who allegedly performed a warrantless search, and also with those of an allegedly suppressed witness, John Guerber, who came forward in late 1980; if the prints were Guerber's, he might have been a witness who was mentioned by Plaintiff during the trial but whose name Plaintiff did not know. (Id. p. 23-24.) The witness (possibly Guerber) had allegedly talked to Plaintiff on the afternoon of the murder at a place miles away from the scene of the crime or crimes, which would tend to show an alibi. (Id. p. 24.) Plaintiff alleges that in closing argument at trial, Defendant Powell disregarded lab reports that stated that several latent prints were of good quality, but no similarities with the victim's prints or those of Richard Carter or of Plaintiff were noted; instead, Powell suggested that there were no recoverable latents and that the pickup was wiped clean. (Cmplt. p. 23.)

Plaintiff argues that testing the fingerprints could show that Guerber was the witness Plaintiff mentioned at trial (apparently in connection with an alibi and/or claim that Plaintiff was at a distance when the crime was committed) whose name or identity was unknown to Plaintiff; Plaintiff alleges that the prosecutor's team found him right after Plaintiff mentioned him, and the team interviewed him, but his statement was suppressed. (Id. p. 24.)

/////

4. Misconduct at Trial

Plaintiff appears to assert bad faith on the part of the government in the prosecution of the case and a denial of due process by the prosecutor with respect to his duty to reveal exculpatory evidence. He alleges that Defendant Morton misrepresented that no reports had been generated by his employer, Forensic Analytical Specialities, in connection with the testing of the evidence (date of testing unclear). (Cmplt. p. 15.) Plaintiff alludes to a telephone message dated March 22 (to Chuck, saying Assistant D.A. Brent Blair of Tulare County had called, and further reflecting that the Clifton case needed a report immediately, that evidence was going to the defense because of the delay, and the guy was very upset) that he alleges shows that the prosecutor in March 1976 did not intend to disclose evidence to Plaintiff. (Cmplt. p. 22.) Plaintiff alleges that evidence was destroyed, and a tape recording made on the second and third day of trial was suppressed and was not found until July 10, 1981, along with two other suppressed witnesses. Plaintiff alleges that Defendant Deputy Sheriff Bob Byrd exceeded his authority when he ordered all evidence destroyed on February 28, 1977. (Cmplt. p. 4.)

Plaintiff claims that his due process rights to a fair trial were violated.

5. Claim of Materiality

Plaintiff alleges that DNA testing of the forty-six hair slides can produce favorable evidence (as the suppressed ABO testing had in June 1976), could possibly provide the identity of the perpetrator and other favorable test results, and then

Plaintiff could file a writ in the trial court based upon material, newly discovered evidence that would in essence raise a reasonable possibility of innocence. (Cmplt. p. 5.)

With respect to the materiality of the evidence, Plaintiff argues that the testing is warranted because there was no physical evidence linking him with the crime, there was no eyewitness to the murder, and suppressed results of testing of the hair found on his sweater showed that it was not the victim's; thus, Plaintiff's guilt would appear a lot less overwhelming than it did during closing argument, where the compatibility of the hair on Plaintiff's sweater with only Plaintiff's daughter and the victim was argued as a fact supporting guilt.

Further, Plaintiff argues that DNA testing of the hairs could lead to identification of the true perpetrator. (Cmplt. p. 27.) Plaintiff alleges that the state did not present any evidence concerning the source of the semen on the victim's pubic hairs, and the state did not perform any DNA tests on any other hair slides that were collected as physical evidence. Testing of the evidence could show the source of the semen and the source of the hairs; the evidence was not discoverable by reasonable diligence earlier, but it is of a type that could change the jury's verdict if a new trial were granted. Plaintiff argues that he is innocent of the crime and should be given an opportunity to prove his innocence via DNA testing. (Cmplt. pp. 27-28.)

C. Section 1983 Claim

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of [state law]... subjects, or causes to be subjected, any citizen of the United States... to the deprivation of any rights, privileges, or immunities secured by the Constitution... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To state a claim pursuant to § 1983, a plaintiff must plead that defendants acted under color of state law at the time the act complained of was committed and that the defendants deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. Gibson v. United States, 781 F.2d 1334, 1338 (9th Cir. 1986). The statute plainly requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. See Monell v. Department of Social Services, 436 U.S. 658, (1978); Rizzo v. Goode, 423 U.S. 362 (1976). The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

1. State Courts as Defendants

The Eleventh Amendment bars suits which seek either damages or injunctive relief against a state, an “arm of the state,” its instrumentalities, or its agencies. Durning v. Citibank, N.A., 950 F.2d 1419, 1422-23 (9th Cir.1991). A suit against a California superior court is a suit against the state and is barred by the Eleventh Amendment. Greater Los Angeles Council on

Deafness, Inc. v. Zolin, 812 F.2d 1103, 1110 (9th Cir. 1987).

Applying these principles to the present case, Plaintiff's suit against the Tulare County Superior Court, the Court of Appeals for the Fifth Appellate District, and the California Supreme Court is barred by the Eleventh Amendment.

2. Heck v. Humphrey

Plaintiff is apparently serving his sentence for murder. It is not clear whether Plaintiff's request for sanctions against the specified persons constitutes a claim for damages. However, assuming so, then Plaintiff's allegations concerning the conduct during trial of Defendant Jay Powell, the trial prosecutor, and Defendant Charles V. Morton, criminologist, are in the nature of malicious prosecution or abuse of process claims relating to Plaintiff's conviction of homicide. Plaintiff is alleging that their conduct caused an allegedly unconstitutional conviction or imprisonment.

It is established that a plaintiff pursuant to § 1983 who seeks damages for allegedly unconstitutional conviction or imprisonment must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. Heck v. Humphrey, 512 U.S. 477, 486-87 (1994). A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Id. at 487. The complaint must thus be dismissed in this regard unless Plaintiff can demonstrate that

the conviction has been invalidated. Id. [2]

3. Claim relating to Post-Conviction DNA Testing

In the Ninth Circuit, it has been held that even without bringing a contemporaneous habeas corpus proceeding, a state prisoner may bring a claim pursuant to § 1983 to assert his due process right to post-conviction access for DNA testing of material biological evidence used to convict him. Osborne v. District Attorney's Office for the Third Judicial District, – F.3d –, 2008 WL 861890, *10, *14 (9th Cir. April 2, 2008) (Osborne II). The post-conviction right of access is recognized in this circuit as being based on the requirements of fundamental fairness, the prosecutor's obligation to do justice rather than simply obtain convictions, and the constitutional imperatives of protecting the innocent from erroneous conviction and ensuring the integrity of the criminal justice system. Osborne II, 2008 WL 861890, *12 (citing Thomas v. Goldsmith, 979 F.2d 746, 749-50 (9th Cir. 1992), in which it was held that in the context of federal habeas corpus proceedings, where it was alleged that the state had suppressed a semen sample which would have exonerated the petitioner of sexual assault charges, the state had a duty to produce any exculpatory semen evidence to aid the petitioner in trying to establish a colorable showing of actual innocence in attempting to meet the miscarriage of justice exception in turn to avoid procedural default and to obtain a full evidentiary hearing on the defaulted claims in the habeas proceeding). The

---

[2] The Court is mindful that Plaintiff's allegations concerning the conduct of the prosecutor and/or his agents at trial may be in the complaint not as a basis for an independent § 1983 claim of wrongful conduct, but rather as evidence of an independent constitutional violation which could comprise in part a basis for a later attack on the conviction.

court in Thomas cited Brady v. Maryland, 373 U.S. 83, 87 (1963) in support of a post-conviction duty to turn over evidence with obvious exculpatory potential that was relevant to a habeas corpus proceeding. Thomas, 979 F.2d at 749-50.

It has further been held that Heck v. Humphrey does not bar an action pursuant to § 1983 regarding a due process right to post-conviction access to biological evidence used to convict him for the purpose of conducting DNA testing because, even if successful, such a suit will not necessarily demonstrate the invalidity of the conviction. Osborne v. District Attorney's Office, 423 F.3d 1050, 1056 (9th Cir. 2005 ) (Osborne I).

a. Access to Material Evidence

In Osborne II, a state prisoner sued under § 1983 to obtain access to evidence that had been used to convict him of kidnapping and sexual assault. He sought access to semen from a used condom and two hairs in order to subject the evidence, at his expense, to STR and mitochondrial DNA testing methods that were unavailable at the time of his trial. Under the circumstances of the case, the testing was capable of conclusively excluding him as the source of the DNA in hairs taken from the victim's body and of the DNA found on the condom that was discovered at the scene of the crime and which, in light of other evidence, was reasonably believed to have been used by one of the two attackers during vaginal penetration of the victim. The co-participant told police that the petitioner had been his accomplice in the sexual assault, and many pieces of physical evidence tended to link the coparticipant to the scene and the crime. The victim identified the Plaintiff as a person

who was "most likely" to have raped and shot her. Osborne II, *1-*2. DQ Alpha DNA testing, which was similar to ABO blood typing, done at the time of trial on the sperm had excluded the co-participant, the victim, and another associate of the co-participant, but had included Plaintiff, who shared the same type with 14.7 to 16 per cent of African Americans, and thus was one of every six or seven black men expected to share the type. More discriminating testing available at the time was not done. The Plaintiff sought to perform even more discriminating DNA testing of the semen.

With respect to the pubic hairs (one from the condom and a second from an article of clothing located under the victim at the time of the assault), DNA testing was not possible at the time of trial due to the sample, but the state's expert did opine that they were dissimilar to the co-participant and his associate, but were consistent with Plaintiff's because of microscopic features. Plaintiff sought to perform short tandem repeat (STR) analysis, which permitted a far more specific genetic profile (to the level of one person in a billion), and mitochondrial DNA (mtDNA) analysis on the hair, which was not available at trial and which did not require the presence of a hair root or follicle.

At trial Plaintiff had defended on the grounds of mistaken identity and alibi defenses. The victim identified Plaintiff, but there were flaws in the identification evidence. After conviction, Plaintiff admitted to the offenses in an effort to obtain parole.

In Osborne II, the court emphasized that no ongoing habeas

action, within which actual innocence would ultimately be an issue, was required to be pending; the plaintiff there was permitted to sue under § 1983 to obtain access to potentially exculpatory evidence and thereby to facilitate or set the stage for a future attack on the conviction, which he alleged he intended to bring after the DNA testing was completed, based on a "freestanding" claim of actual innocence (i.e., despite the lack of any constitutional error at his trial, his actual innocence rendered his incarceration unconstitutional). Id. *10. The court in Osborne II noted that in this circuit, it is an open question whether a freestanding actual innocence claim is cognizable under federal law, but it is assumed that freestanding innocence claims are possible and that the minimum standard for demonstrating such a claim for a habeas petitioner is to go beyond demonstrating doubt about guilt and affirmatively prove that he is probably innocent. Id. *11. The court concluded that until the Plaintiff there had actually brought a separate actual innocence claim and had been given the opportunity to develop the fact supporting it, his access-to-evidence claim might proceed on the well-established assumption that his intended freestanding innocence claim would be cognizable in federal court. Id. at *11.

With respect to the scope of the right of access, the court expressly rejected the government's argument that the Plaintiff must affirmatively prove that he is probably innocent in order to have access to the evidence. Osborne II, *12-*13. This is because the most stringent materiality standard for simply obtaining post-conviction access to evidence must be more lenient that the standard of proof that a plaintiff must ultimately meet on habeas

corpus. Id.

The court did not, however, determine the precise standard for materiality required for the evidence sought to be tested in order to state a claim for access. This was because it was unnecessary to do so in the case before it given the status of the evidence. Brady itself required not proof that a person would, or even probably would, prevail at trial if the evidence were disclosed, but only that there be a reasonable probability of a more favorable result at trial, which in turn was established by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Osborne II at *13 (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

In Thomas, the court had not articulated a specific standard of materiality, but rather had noted that a semen sample, or tests thereof, might enable the petitioner to make a colorable showing of actual innocence in light of the obvious exculpatory potential of semen evidence in a sexual assault case. Osborne II, * 13 (citing Thomas, 979 F.2d at 749-50). In Jones v. Wood, 114 F.3d 1002 (9th Cir. 1997), the court had found a habeas petitioner entitled to post-conviction testing of physical evidence and other discovery because the discovery was essential for the petitioner to develop fully an ineffective assistance of counsel claim, and the test results might establish the prejudice required to make out such a claim. Osborne II, *14. In Majoy v. Roe, 296 F.3d 770, 776-77 (9th Cir. 2002), the court held that the district court should order testing conducted, hold an evidentiary hearing to permit full development of the facts

supporting a "gateway" actual innocence claim under Schlup v. Delo, 513 U.S. 298 (1995), and determine if that claim was factually meritorious before considering whether the claim was jurisdictionally barred. In Osborne II, the court noted that it was sufficient in Majoy that there was a distinct possibility that given the opportunity, the petitioner may be able to muster a plausible factual case meeting the exacting gateway standard of actual innocence. Osborne II, *14.

The court in Osborne II concluded that the showing of materiality made in that case was sufficient to require disclosure. The Court held that the standard of materiality applicable to Osborne's claim for access is no higher than a reasonable probability that, if exculpatory DNA evidence were disclosed to Plaintiff, he could prevail in an action for post-conviction relief, which in the context of a freestanding claim of actual innocence would be established by a reasonable probability that Plaintiff could affirmatively prove that he is probably innocent. Osborne II, *15.

The court reiterated that the reasonable probability standard of materiality did not require a demonstration by a preponderance that disclosure of the DNA evidence would ultimately enable the plaintiff to prove his innocence. Id. Further, it was not a question of whether the plaintiff would more likely than not be granted habeas relief with the evidence, but whether in the absence of the DNA evidence, Plaintiff would receive a fair habeas hearing that would result in a judgment worthy of confidence. Id. The court must consider all the evidence, old and new, incriminating and exculpatory, and make a

probablistic determination about what a reasonable fact-finder would do. Id. *16. The Osborne court noted that the key issues were whether the testing sought was accessible pretrial, how certain an identification or exclusion resulting from the test would be, and whether the evidence had the potential to provide strong evidence upon which the Plaintiff might seek post-conviction relief. Osborne II, *8.

Here, as in Osborne II, the evidence sought to be tested was recovered at the crime scene or from the victim or Plaintiff. The evidence concerns DNA testing of hairs and semen at the scene of a sexual assault. It is unclear whether a pubic hair of the victim, with or without semen of the alleged perpetrator, is extant, but Plaintiff appears to allege that it is among the hair slides, has not been tested, and should be tested. In light of the allegations that the state did not present any evidence concerning the source of the semen on the victim's pubic hairs, and the state did not perform any DNA tests on any other hair slides that were collected as physical evidence, it appears that there is ample exculpatory potential of the hair evidence. Testing of the evidence could show the source of the semen and the source of the hairs.

Other changes in the evidentiary picture weigh in Plaintiff's favor, including the post-trial testing of debris and blood on the surfaces of the Plaintiff's knife which excluded the victim's blood type or genes; this would tend to negate the prosecution's trial argument that the knife had been used to murder the victim and then had been cleaned. Further, DNA test results from April 2002 proved that Plaintiff was not linked to

the three items belonging to the victim (her pants, her underpants, and her sanitary napkin). The ABO test results from the time of trial that were favorable to Plaintiff and that Plaintiff claims were suppressed and not disclosed until almost twenty-three years later through a federal court discovery order apparently reveal that the hair was consistent with Plaintiff's hair, but not with that of the victim.

Considering the type of evidence and the evidentiary context, this evidence arguably reaches the level of a reasonable probability that, if exculpatory DNA evidence were disclosed to Plaintiff, he could prevail in an action for post-conviction relief. If Plaintiff intends to raise a freestanding claim of actual innocence, arguably the evidence to which access is sought would reflect a reasonable probability that Plaintiff could affirmatively prove that he is probably innocent. In the present case, the Court is again faced with the obvious exculpatory potential of semen evidence in a sexual assault case. If Plaintiff intends to raise an independent constitutional violation, the evidence sought would bear upon the prejudice suffered by Plaintiff.

The precise parameters of the testing sought by Plaintiff is unclear because Plaintiff's allegations as to what the testing could show are not set forth in scientific terms. Further, the complete collection of evidence supporting Plaintiff's conviction has not exhaustively been set forth. However, at this screening stage, the Court is required to draw all inferences in favor of Plaintiff.

The Court notes that it may be inferred from the allegations

that the evidence was not discoverable by reasonable diligence earlier.

b. Proper Defendant

Section 1983 requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978). In order to state a claim for relief under section 1983, plaintiff must link each named defendant with some affirmative act or omission that demonstrates a violation of plaintiff's federal rights.

Here, as previously noted, the courts are not persons under § 1983. In Osborne II, the defendant who had control of the evidence to which access was sought was the Alaska prosecutor's office, which apparently qualified as a person, and not a state agency, for the action pursuant to § 1983.

In the present action, Plaintiff has named as a defendant the Deputy Attorney General who, it is presumed, worked on the case in state court. However, it is not clear that this person or officer has the control or custody of the evidence in question, or that he is the proper or sole proper Defendant. It is not clear how the Court could order effective injunctive relief

against him with respect to testing of evidence. Plaintiff will have an opportunity to allege facts in this regard in an amended complaint.

The Eleventh Amendment bars suits which seek either damages or injunctive relief against a state, an "arm of the state," its instrumentalities, or its agencies. Durning v. Citibank, N.A., 950 F.2d 1419, 1422-23 (9th Cir.1991). The Eleventh Amendment bars damages actions against state officials in their official capacity because such actions are in essence against the state itself. Doe v. Lawrence Livermore National Laboratory, 131 F.3d 836, 839 (9th Cir. 1997). However, the Eleventh Amendment does not bar suits for damages brought against state officials in their personal capacities. Ashker v. California Department of Corrections, 112 F.3d 392, 394-95 (9th Cir. 1997). Further, the Eleventh Amendment does not bar a suit against state officials in their official capacities seeking prospective injunctive relief. Doe v. Lawrence Livermore National Laboratory, 131 F.3d at 839.

The Court concludes that Plaintiff has not stated facts indicating how Defendant Rhodes, the Deputy Attorney General, is depriving Plaintiff of his right to access to the evidence.

Further, Plaintiff has named former Tulare County District Attorney Jay Powell, who does not appear to be alleged to have deprived Plaintiff of any rights concerning post-trial access to evidence. Further, it does not appear that Defendant has identified the person/s, or entity or entities, who are presently depriving Plaintiff of any right to access to evidence. Plaintiff will have an opportunity to name a proper defendant or defendant in an amended complaint.

c. Prosecutorial Immunity

The Court notes that Plaintiff has alleged facts, and may in an amended complaint allege additional facts, concerning the conduct of prosecutors. Thus, the Court informs Plaintiff of the basic principles of prosecutorial immunity in actions pursuant to § 1983.

State prosecutors are absolutely immune from civil liability for acts taken in their official capacity that are closely associated with the judicial process, such as initiating prosecution and presenting the state's case. Imbler v. Pachtman, 424 U.S. 409, 427, 430-431 (1976); Milstein v. Cooley, 257 F.3d 1004, 1008 (9th Cir. 2001). However, when prosecutors perform administrative or investigative functions, only qualified immunity is available. Botello v. Gammick, 413 F.3d 971, 975-76 (9th Cir. 2005).

d. State Action

To state a claim under section 1983, a plaintiff must plead (1) that the defendant acted under color of state law and (2) that the defendant deprived him of rights secured by the Constitution or federal statutes. Gibson v. United States, 781 F.2d 1334, 1338 (9th Cir. 1986). Generally, private parties are not acting under color of state law. See Price v. Hawaii, 939 F.2d 702, 707-08 (9th Cir. 1991). However, "[a]ction taken by private individuals may be 'under color of state law' where there is 'significant' state involvement in the action." Howerton v. Gabica, 708 F.2d 380, 382 (9th Cir. 1983). A conspiracy between a private party and a state official to deprive others of constitutional rights may result in action by a private party

under color of state law, but to prove a conspiracy between the state and private parties under section 1983, the Plaintiff must allege an agreement or meeting of the minds to violate constitutional rights; each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. United Steelworkers v. Phelps Dodge Corp., 865 F.2d 1539, 1540-41 (9th Cir. 1989) (en banc). The defendants must by some concerted action have intended to accomplish some unlawful objective for the purpose of harming another which results in damage. Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1301 (9th Cir. 1999).

Here, Plaintiff names Charles V. Morton, a criminologist. Plaintiff has not alleged facts showing that Morton acted under color of state law.

4. Suit against Defendant Bob Edward Byrd

Plaintiff sues Defendant Byrd, retired, a Tulare County Sheriff's Officer apparently around the time of Plaintiff's trial, for ordering some or all evidence in Plaintiff's case destroyed after Plaintiff had been sentenced. Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Plaintiff has not alleged facts showing that specific evidence was destroyed. Further, Plaintiff has not alleged facts warranting an inference that destruction of any evidence was in bad faith. Accordingly, Plaintiff has failed to state a claim for destruction of evidence.

II. Leave to Amend

In summary, the Court finds it necessary to dismiss the complaint in its entirety. Plaintiff has failed to state a cognizable claim against the defendants and has failed to plead facts demonstrating jurisdiction in this Court. However, it is possible that Plaintiff can allege a set of facts, consistent with the allegations, in support of the claim or claims that would entitle him to relief. Thus, the Court will grant Plaintiff an opportunity to amend the complaint to cure the deficiencies of this complaint. Failure to cure the deficiencies will result in dismissal of this action without leave to amend.

A complaint must contain a short and plain statement as required by Fed. R. Civ. P. 8(a)(2). Although the Federal Rules adopt a flexible pleading policy, a complaint must give fair notice and state the elements of the claim plainly and succinctly. Jones v. Community Redev. Agency, 733 F.2d 646, 649 (9th Cir. 1984). Plaintiff must allege with at least some degree of particularity overt acts which the defendants engaged in that support Plaintiff's claim. Id.

An amended complaint supercedes the original complaint, Forsyth v. Humana, Inc., 114 F.3d 1467, 1474 (9th Cir. 1997); King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987), and must be "complete in itself without reference to the prior or superceded pleading," Local Rule 15-220. Plaintiff is warned that "[a]ll causes of action alleged in an original complaint which are not alleged in an amended complaint are waived." King, 814 F.2d at 567 (citing to London v. Coopers & Lybrand, 644 F.2d 811, 814 (9th Cir. 1981)); accord Forsyth, 114 F.3d at 1474.

III. Disposition

Accordingly, it IS ORDERED that:

1) Plaintiff's complaint IS DISMISSED with leave to amend; and

2) Plaintiff IS GRANTED thirty days from the date of service of this order to file an amended complaint that complies with the requirements of the pertinent substantive law, the Federal Rules of Civil Procedure, and the Local Rules of Practice; the amended complaint must bear the docket number assigned this case and must be labeled "First Amended Complaint"; failure to file an amended complaint in accordance with this order will be considered to be a failure to comply with an order of the Court pursuant to Local Rule 11-110 and will result in dismissal of this action.

IT IS SO ORDERED.

**Dated: April 18, 2008**

**/s/ Sandra M. Snyder**
UNITED STATES MAGISTRATE JUDGE